# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Gregory Wayne Keefer, | ) | C/A No.: 1:18-92-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated August 17, 2018, referring this matter for disposition. [ECF No. 15]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals ("Fourth Circuit"). [ECF No. 14].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul is substituted for Nancy A. Berryhill.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for an award of benefits as set forth herein.

I.     Relevant Background

A.     Procedural History

On February 22, 2010, Plaintiff filed an application for DIB in which he alleged his disability began on August 10, 2009. Tr. at 117–18. His application was denied initially and upon reconsideration. Tr. at 57–60, 65–66. On March 10, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thomas G. Henderson. Tr. at 25–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 21, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–20. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on October 4, 2011. Tr. at 435–36. On March 13, 2013, the undersigned issued an order reversing the Commissioner's decision and remanding the matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g). Tr. at 439–65. On

April 24, 2013, the Appeals Council issued an order remanding the case to an ALJ. Tr. at 466–69.

On September 26, 2013, Plaintiff had a second hearing before ALJ Henderson. Tr. at 406–14 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 7, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 396–405. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on January 27, 2014. *Keefer v. Commissioner of Social Security Administration*, No. 1:14-236-SVH, ECF No. 1. On January 5, 2015, the court issued an order reversing the Commissioner's decision and remanding the case to an ALJ. Tr. at 610–43. On February 7, 2015, the Appeals Council issued an order vacating the final decision of the Commissioner, remanding the case to an ALJ for further proceedings, and directing that the case be assigned to a different ALJ. Tr. at 644–47.

On August 24, 2015, Plaintiff had a third hearing. Tr. at 582–99 (Hr'g Tr.). ALJ Ronald Sweeda issued an unfavorable decision on September 23, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 570–81. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on November 24, 2015. *Keefer v. Commissioner of Social Security Administration*, No. 1:15-4738-SVH, ECF No. 1. On September 30, 2016, the court issued an order reversing the

Commissioner's decision and remanding the case to an ALJ. Tr. at 775–806. On January 6, 2017, the Appeals Council issued an order vacating the final decision of the Commissioner and remanding the case to an ALJ for further proceedings. Tr. at 771–74.

On June 23, 2017, Plaintiff had a fourth hearing. Tr. at 756–70 (Hr'g Tr.). ALJ Sweeda issued an unfavorable decision on October 30, 2017, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 729–49. The ALJ's decision provided Plaintiff with the option to either file exceptions with the Appeals Council within 30 days or to file an action in this court within 60 days of the date on which the ALJ's decision became final.[2] Tr. at 729–30. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 10, 2018. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 53 years old on his date last insured ("DLI").[3] Tr. at 117. He completed the eighth grade. Tr. at 135. His past relevant work ("PRW")

---

[2] The ALJ's decision explained that it would become the final decision of the Commissioner on the sixty-first day after the date it was issued. Tr. at 730.

[3] According to the Social Security Administration's Program Operations Manual Systems ("POMS"), the DLI is "the last day in the last quarter when disability insured status is met." POMS RS 00301.148. Plaintiff's DLI was September 30, 2009.

was as a boiler operator and truck driver. Tr. at 191. He alleges he has been unable to work since August 10, 2009. Tr. at 117.

2.   Medical History

a.   Records Prior to Plaintiff's DLI

On January 16, 2008, Plaintiff complained of fatigue to a physician at Doctors Care, where an assessment included fatigue and joint pain. Tr. at 301. Lab results dated January 21, 2008, indicated hypothyroidism, and Plaintiff was started on Levothyroxine. Tr. at 292. Notes from follow up visits on January 21, 2008, and February 18, 2008, showed diagnoses of hypothyroidism, hyperlipidemia, and depression/anxiety. Tr. at 288, 291. In May 2008, Plaintiff's prescriptions included Levothyroxine for hypothyroidism, Celexa for depression, and Pravastatin for elevated cholesterol. Tr. at 286.

On May 3, 2009, Plaintiff presented to the emergency room ("ER") at Roper Hospital with complaints of lower abdominal pain and difficulty urinating. Tr. at 194. He reported a history of kidney stones, prostatic stones, anxiety, and hemorrhoids. *Id.* Discharge diagnoses included chest pain of unknown cause and epididymitis (inflammation of the organ just behind the testicle, often caused by heavy lifting/exercise). Tr. at 206. The attending physician recommended Plaintiff follow up with cardiac stress testing and an ultrasound. Tr. at 206–07.

Plaintiff followed up with Francis Tunney, M.D. ("Dr. Tunney"), at Patient One on May 5, 2009. Tr. at 218. He complained of snoring and daytime fatigue and reported a history of depression. *Id.* On examination, Plaintiff exhibited normal gait, stance, musculoskeletal posture, balance, mood, and memory. Tr. at 220. Dr. Tunney noted that Plaintiff's scrotal pain was of unclear etiology and advised him to follow up with his primary care physician. *Id.*

b.  Records After Plaintiff's DLI

Plaintiff initiated care with David Castellone, M.D. ("Dr. Castellone"), of Palmetto Primary Care on November 13, 2009. Tr. at 368. He reported pain in his hips, legs, and back and swelling in his right leg. *Id.* He stated he had been diagnosed with hypertension, anxiety, and depression years prior and indicated he had been experiencing back ache and pain for months. *Id.* Dr. Castellone diagnosed new anxiety, hypertension, degenerative disc disease ("DDD"), and paresthesia/weakness in the legs. *Id.* He also ordered magnetic resonance imaging ("MRI") and nerve conduction studies ("NCS") and prescribed Celexa and Lortab. Tr. at 369. An MRI of Plaintiff's lumbar spine dated November 19, 2009, revealed mild degenerative facet arthropathy at L5–S1, but no compromise of the exiting L5 nerve root. Tr. at 222.

Dr. Ruth Hoover conducted NCS on November 24, 2009. Tr. at 365. She noted that the results were difficult to interpret due to a lot of cramping during the test. *Id.* She noted signs of acute (rather than chronic) nerve root irritation at S1 bilaterally. *Id.* Dr. Hoover opined that Plaintiff's description of his pain was a bit confusing in that it seemed variable. *Id.* She stated the MRI was not impressive, but that she was "impressed by the clinical picture and the appearance of S1 irritation despite the MRI." *Id.* She ultimately noted the NCS were within normal limits, but that some of Plaintiff's muscles showed moderately increased spontaneous activity. *Id.*

Plaintiff returned to Dr. Castellone on December 1, 2009, with constipation, back pain, depression, and anxiety. Tr. at 359. He described his back pain, depression, and anxiety as severe and indicated the back pain began months prior. *Id.* Dr. Castellone diagnosed Plaintiff with worsening DDD and worsening radiculopathy, as well as stable anxiety and hypertension. Tr. at 361. He referred Plaintiff to a pain clinic and gastroenterologist. *Id.*

Plaintiff presented to Summar C. Phillips, M.D. ("Dr. Phillips"), of Pain Care Physicians of Charleston on December 3, 2009, with lower back pain. Tr. at 225. He reported pain in his lower back that had begun years prior. *Id.* He stated the pain radiated into his hips, buttocks, legs, and feet bilaterally and was sustained at five to six on a 10-point scale most days. *Id.* He

described it as being worse in the evening and sometimes associated with weakness, tingling, and numbness. *Id.* He stated Lortab worked best to alleviate his pain, but only "t[ook] the edge off." *Id.* Plaintiff reported his daily activities included working as a truck driver and general house maintenance, but said that he was unable to perform those tasks without pain. *Id.* Dr. Phillips administered an epidural steroid injection ("ESI") at L5–S1. Tr. at 226. Following the injection, Plaintiff reported that his pain was reduced to a four. *Id.*

Plaintiff underwent nuclear stress testing on December 8, 2009. Tr. at 305. He was assessed as having fair exercise tolerance. *Id.* The physician who administered the test noted a mild defect, but the results were otherwise normal. *Id.*

Plaintiff returned to Dr. Phillips on December 23, 2009. Tr. at 229. He reported his response to the prior injection was "real good" for two weeks, but he still had weakness and his pain gradually returned to a five. *Id.* Dr. Phillips administered another ESI at L5–S1, which he indicated reduced his pain to a two. Tr. at 230, 231.

Plaintiff underwent a cervical MRI on December 31, 2009. Tr. at 307. It revealed mostly mild diffuse spondylosis and the presence of a disc osteophyte complex at C6–7 that extended intraforaminally on both sides and could contact the exiting C7 nerve roots. *Id.* The MRI also demonstrated a

focal central superior and inferior extrusion that caused moderate central stenosis and mild anterior cord flattening. *Id.*

On January 6, 2010, Plaintiff reported to Dr. Phillips that the last lumbar ESI had provided no relief, necessitating his daily use of Lortab and Flexeril. Tr. at 233. Dr. Phillips noted Plaintiff's leg pain had improved significantly, but he continued to experience persistent pain in his lower back and buttocks. *Id.* Plaintiff reported his medications helped as long as he sat still. *Id.* He stated he had been limiting his daily activity to just resting and taking it easy due to the pain. *Id.* On examination, Plaintiff exhibited tenderness in the area of the sacroiliac ("SI") joint on the right, tenderness over the sacrum midline, and pain upon flexion and extension of the lumbar spine. *Id.* However, he maintained full range of motion ("ROM") of the lumbar spine. *Id.* Dr. Phillips diagnosed low back pain, radicular symptoms of the lower limbs, neck pain, cervical radiculopathy, sacroiliitis, and facet arthropathy syndrome. *Id.* She opined Plaintiff's pain could be caused by either the facet arthropathy shown on the MRI or by SI joint arthropathy. Tr. at 234. Dr. Phillips noted that Plaintiff's leg pain, which had previously prevented him from walking, improved greatly with the two lumbar injections. *Id.* However, Plaintiff continued to report leg pain in a bilateral S1 pattern while lying flat. *Id.* She further noted that given Plaintiff's good response to lumbar ESI, Plaintiff most likely had simple lumbar

radiculopathy. *Id.* Dr. Phillips recommended Plaintiff start Celebrex and undergo another ESI in one week. *Id.*

Plaintiff returned to Dr. Phillips on January 13, 2010, complaining of severe pain in his neck for several days. Tr. at 235. Dr. Phillips started to administer a cervical ESI, but did not complete after Plaintiff reported lightheadedness and dizziness. *Id.* Plaintiff returned the following day, and Dr. Phillips performed a successful cervical ESI at C5–6. Tr. at 241.

On January 28, 2010, Plaintiff reported the cervical ESI had helped the pain and stiffness in his neck and some of the radiating pain down his arms. Tr. at 243. He complained of weakness in his legs and pain between his shoulder blades and in his low back. *Id.* On examination, Dr. Phillips found thoracic and lumbar paraspinal tenderness and assessed Plaintiff's progress as "moderate at best." Tr. at 243–44. She noted that Plaintiff would be a great candidate for a spinal cord stimulator. Tr. at 244. She suspected Plaintiff's upper back pain was muscular in nature and prescribed a transcutaneous electrical nerve stimulation ("TENS") unit, ice therapy, and lidoderm patches. Tr. at 244.

Plaintiff received another lumbar ESI on February 16, 2010. Tr. at 245. On March 9, 2010, Plaintiff reported relief from that injection, but stated that all the injections wore off after a while. Tr. at 249. He complained of shooting pain and muscle spasms in his hip, legs, and back. *Id.* He reported his pain

was aggravated by bending or twisting and was improved by taking hot baths and using medication. *Id.* Although still in pain, he agreed that his quality of life had improved with the injections and that he was able to perform his normal activities in less pain. *Id.*

On April 8, 2010, Plaintiff sought an opinion regarding leg weakness, discomfort, and refractory pain from neurologist John Plyler, M.D. ("Dr. Plyler"). Tr. at 317. He complained of leg weakness and discomfort in his hips and legs, episodic arm jerking, dizziness, and numbness in his feet. *Id.* He reported a history of multiple ESIs with only marginal response over time. *Id.* On examination, Plaintiff had decreased, but symmetric reflexes, patchy sensory spots distally, and some spasm in his neck and lumbar muscles. *Id.* Dr. Plyler noted he was "significantly overweight." *Id.* He assessed chronic neck/back pain, paresthesia and dysthesia, possible myofascial fibromyalgia pain syndrome, tinnitus, anxiety, and depression. Tr. at 317–18. He recommended an electrophysiology evaluation, brain imaging, and baseline labs. Tr. at 318. A nerve study was normal. Tr. at 319–21. An MRI of Plaintiff's thoracic spine showed left central disk protrusion at T9–T10 that effaced the left ventral aspect of the thoracic cord; however, the thoracic cord demonstrated normal signal. Tr. at 316. An MRI of Plaintiff's brain was unremarkable. Tr. at 313, 315.

In a follow-up visit with Dr. Plyler on April 27, 2010, Plaintiff reported leg weakness and discomfort in his legs and throughout his spine. Tr. at 313. He indicated his legs gave out with any physical activity. *Id.* He reported tremors, shakes, and syncopal and blackout events, which he stated had been occurring for about five years. *Id.* Dr. Plyler recommended an additional thyroid panel, a vitamin D supplement, a possible rheumatological evaluation, a sleep evaluation, a neurosurgical evaluation for the thoracic disc, and a cardiology opinion with regard to syncope. Tr. at 313–14.

State-agency consultant Olin Hamrick, Jr., Ph. D., completed a psychiatric review technique form ("PRTF") on June 2, 2010. Tr. at 251–64. He found there was insufficient evidence upon which to make a medical disposition or assess Plaintiff's functional limitations. *Id.*

On July 29, 2010, Plaintiff reported to Dr. Castellone's office that he had almost passed out, that the left side of his face was swollen, and that he was experiencing memory loss. Tr. at 357. On examination, Plaintiff exhibited decreased ROM and pain in his extremities. Tr. at 358. He was referred for a carotid Doppler flow study. *Id.*

On August 3, 2010, Plaintiff consulted with Jason Highsmith, M.D. ("Dr. Highsmith"), a neurosurgeon. Tr. at 331. On examination, Dr. Highsmith noted that Plaintiff was in significant pain with motion and was "clearly uncomfortable." *Id.* Plaintiff exhibited paraspinous tenderness

throughout the craniocervical junction, as well as in the neck, mid-back, and low back. *Id.* He also had significant pain with palpation of his right hip and "actually wince[d] significantly." *Id.* Dr. Highsmith concluded that because the thoracic MRI showed no focal lesion or other pathology of the thoracic spine, Plaintiff was not a surgical candidate. Tr. at 332. He recommended Plaintiff follow up with a rheumatologist. *Id.*

Plaintiff returned to Dr. Castellone on August 12, 2010, and described his back pain as gnawing and severe. Tr. at 355. Plaintiff's memory and dizziness were noted to be better with medication. *Id.* Dr. Castellone noted that Plaintiff had "new" fibromyalgia and that his anxiety and hypertension were improving. Tr. at 356. He referred Plaintiff to a rheumatologist. *Id.*

State-agency consultant Lisa Varner completed a PRTF on August 25, 2010. Tr. at 266–79. She determined the record provided insufficient evidence upon which to make a medical disposition or to assess Plaintiff's functional limitations. *Id.* She noted that a record from May 2009 showed a diagnosis of depression; however, examination showed normal orientation, affect, mood, memory, insight, and judgment. Tr. at 278.

On November 1, 2010, Plaintiff was seen by Gregory Niemer, M.D. ("Dr. Niemer"), at Low Country Rheumatology. Tr. at 341. He reported daily neck and back pain and stated the ESIs and TENS unit had not helped. *Id.* His diagnoses included fibromyalgia with multiple trigger points and DDD of

the lumbar and cervical spine. Tr. at 345, 347. Dr. Niemer recommended Plaintiff follow up with pain management for injections. Tr. at 345. Plaintiff followed up with Dr. Niemer on January 26, 2011. Tr. at 340. He reported having trouble getting to sleep and indicated his pain impacted his activities of daily living ("ADLs"). *Id.* Examination demonstrated 16 of 18 fibromyalgia tender points. *Id.* Dr. Niemer diagnosed fibromyalgia, DDD, and insomnia. *Id.*

Plaintiff saw Dr. Castellone for an annual examination on February 4, 2011. Tr. at 352. Dr. Castellone noted that Plaintiff's DDD and fibromyalgia were worsening and that his anxiety was stable. Tr. at 354. He recommended diet, exercise, and stress management. *Id.*

On February 10, 2011, Plaintiff saw Barton Sachs, M.D. ("Dr. Sachs"), of the Medical University of South Carolina's ("MUSC's") Orthopaedic Spine Surgery Center. Tr. at 386. Plaintiff described total body pain and discomfort and numbness throughout all four extremities. *Id.* He reported that he had stopped driving a truck over a year prior because of dizzy spells and passing out. *Id.* On examination, Plaintiff was in no apparent distress and appeared to have full ROM in all four extremities. Tr. at 386–87. Dr. Sachs noted that Plaintiff's x-rays showed some advanced DDD at C6–7 with some spurring, but did not indicate gross encroachment of the spinal canal. Tr. at 387. Plaintiff had no significant areas of tenderness at C7 and no gross instability

on flexion or extension. *Id.* The radiologist interpreted the x-rays to show no alignment abnormalities and mild DDD. Tr. at 392. Dr. Sachs noted that Plaintiff moved well. Tr. at 387. His impression was that Plaintiff's primary condition was one of diffuse pain associated with dizziness and blackout spells, that the condition was primarily neurological, as opposed to spinal, and that Plaintiff did not require surgical intervention. *Id.* He recommended Plaintiff follow up with a neurologist. *Id.*

On April 13, 2011, Plaintiff presented to TriCounty Radiology Associates for a thoracic MRI to assess his complaints of midback pain and chronic mid- and upper-back pain radiating down both arms and a cervical MRI to assess his complaints of neck and bilateral shoulder pain and numbness in his fingers. Tr. at 914, 916. Donald E. Olofsson, M.D. ("Dr. Olofsson"), interpreted the thoracic MRI as indicating mild-to-moderate DDD of the thoracic spine, most notable at T9–10 with a paracentral left thin disc extrusion. Tr. at 914. He noted contact of the ventral cord and possible contact of the left ventral nerve rootlet at T9–10, but no significant stenosis or frank impingement. *Id.* He interpreted the cervical MRI to show slight progression of the degenerative change since the 2009 MRI. Tr. at 916. He noted neural contact at multiple levels. Tr. at 916–17. Dr. Olofsson stated "[c]orrelation for symptoms in the distribution of the right C6, both C7 and the right C8 nerve may be helpful from contact at the right lateral recess at

C5–6, both neural foramen at C6–7 and the right neural foramen at C7–T1." Tr. at 917. He noted no significant stenosis or frank impingement, but stated there was "contact of the exiting right nerve roots at C3–4 and correlation for symptoms in the distribution of the right C4 may be helpful as well." *Id.*

On April 14, 2011, Plaintiff returned to TriCounty Radiology Associates for an MRI of his lumbar spine based on complaints of low back pain, right leg pain, and weakness. Tr. at 913. Troy Marlow, M.D. ("Dr. Marlow"), interpreted the MRI as showing mild caudal spondylosis with no severe stenosis or neural impingement. *Id.*

On December 16, 2012, Plaintiff presented to Trident Regional Medical Center for a computed tomograph ("CT") scan of his cervical spine to assess his severe neck pain. Tr. at 918. Joseph I. Gaglione, M.D. ("Dr. Gaglione"), found anatomic alignment with straightening, preserved vertebral heights, mild disc narrowing at C4–5 and C5–6, significant disc space narrowing at C6–7 and C7–T1, normal prevertebral soft tissues and cranial cervical junction, and anatomically aligned facet joints. *Id.* Dr. Gaglione assessed spondylosis and no acute fracture. Tr. at 918–19.

On September 18, 2013, Plaintiff presented to Byron N. Bailey, M.D. ("Dr. Bailey"), with complaints of persisting mid-thoracic pain and muscle spasms. Tr. at 930. Dr. Bailey noted that Plaintiff had undergone surgery on his cervical spine on January 29, 2013, and transpedicular T9–10 discectomy

with interbody fusion and posterolateral fusion on July 16, 2013. *Id.* On examination, Dr. Bailey found Plaintiff exhibited good strength in his lower extremities, including his iliopsoas hip flexors, quadriceps, and gastrocs anterior tibialis. *Id.* Dr. Bailey observed Plaintiff walked with a cane in his right hand. *Id.* He assessed acute cervical radiculopathy and herniated thoracic disc without myelopathy. *Id.* Dr. Bailey x-rayed Plaintiff's thoracic spine and found good alignment and no change in instrumentation. *Id.* He started Plaintiff on Flexeril for his spasms. *Id.*

On September 30, 2013, Plaintiff presented to Dr. Keith D. Merrill with a right ankle fracture. Tr. at 932. Plaintiff reported hurting his ankle after falling off steps. *Id.* Dr. Merrill noted Plaintiff was partially able to bear weight and was in a wheelchair. *Id.* He noted a normal physical examination and provided Plaintiff with a fracture boot. Tr. at 934.

### 3. Lay Witness Statements

Plaintiff submitted lay witness statements from his wife, his cousin, a friend, and a former supervisor.

In a letter dated January 28, 2011, Plaintiff's cousin, Donna Sykes, stated she had recently moved into Plaintiff's home to help him with ADLs. Tr. at 174. She stated even walking to the mailbox could be difficult for Plaintiff on some days, as he had to lie down after taking short walks. *Id.* She indicated she assisted Plaintiff by providing cooking and shopping services

17

and transporting him to doctors' appointments. *Id.* She stated Plaintiff demonstrated signs of pain on his face and verbal outbursts upon attempting to move about. *Id.* She noted Plaintiff changed positions constantly and had difficulty bending. *Id.*

In a letter dated February 12, 2011, Plaintiff's friend, Shawn Sandella, reported that he sometimes helped Plaintiff with his yard work, especially if it involved any lifting. Tr. at 177. He noted having seen Plaintiff in pain from trying to pick up pine cones in his yard. *Id.* He stated Plaintiff required assistance with any tasks that required bending or lifting. *Id.*

In a letter dated March 1, 2011, Plaintiff's wife, Jane Keefer, reported that she struggled with balancing her work as a licensed practical nurse with taking care of her husband. Tr. at 184. She stated Plaintiff had kept her up several times during the night because of his inability to obtain relief from pain. *Id.* She reported Plaintiff could not assist with household chores, maintain the cars, or perform household repairs. *Id.* She stated Plaintiff's medication resulted in memory loss, his pain caused him to be depressed and moody, and he could no longer play with his grandchildren or sit long enough to watch television. *Id.*

In a letter dated March 3, 2011, Plaintiff's former boss, Dennis Hair ("Mr. Hair"),[4] reported that Plaintiff had many absences for depression and back problems during the last 10 years that Plaintiff worked under his supervision. Tr. at 393. He stated that Plaintiff ultimately had so many absences that he had to leave his job. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    March 10, 2011

At the hearing on March 10, 2011, Plaintiff stated that he lived with his wife, who was employed. *Id.* He testified that a cousin moved in to assist him three months prior. Tr. at 35.

He testified that he last worked as a self-employed truck driver on August 10, 2009. Tr. at 30. He stated he was an independent driver for approximately one year and, prior to that, worked as a company driver. Tr. at 31. He testified that he was also previously employed as a boiler operator, but left that job because of back, neck, and leg problems and depression. Tr. at 32 and 34. He stated that in the months prior to his alleged onset date, he turned down jobs because his back pain rendered him unable to drive. Tr. at

---

[4] Mr. Hair was Plaintiff's supervisor at Westvaco. Tr. at 394. Plaintiff's earnings record reflects earnings from Westvaco from 1995 through 1998, but does not indicate for whom he was employed prior to 1995. Tr. at 698.

37. He testified that his wife went on the road with him for the last six weeks that he worked to take care of him. *Id.* He said she would tell him to pull over if it looked like he was starting to get dizzy or was in substantial pain. *Id.* He stated that on his last driving trip, he abandoned the load half way because he could not finish the trip. Tr. at 38. Plaintiff testified that sitting in his truck became extremely painful during his last few months of work and that he could only push himself to do so for 30 minutes before having to stop. Tr. at 40.

Plaintiff testified that injections for his neck and back pain provided relief "to a degree." Tr. at 39. He stated they made the pain bearable, but did not allow him to walk for more than 15 or 20 minutes. Tr. at 39–40. He stated that he was told that he had so much scar tissue that he was not a candidate for surgery. Tr. at 41.

Plaintiff testified he spent most of his time lying around the house. Tr. at 32. He stated that he tried to walk some because his doctor told him it would help alleviate his arthritis symptoms. *Id.* He indicated he would walk around his house, yard, or "down the street a little ways," but stated that he always had to lie down to obtain pain relief after walking. Tr. at 32–33. He stated that his walks lasted 10 to 15 minutes. Tr. at 36. He estimated he spent up to half his day lying on the floor. Tr. at 36. Plaintiff explained that he would lie on the floor rather than on a couch or sofa because he

experienced dizzy spells and was afraid he would fall. Tr. at 37. He stated that he could sit in a regular chair for about 10 minutes. Tr. at 47. He indicated he could force himself to sit longer, as he stated he was doing during the hearing, but that he would "pay for it" when he returned home and would have to take muscle relaxers and lie down. *Id.*

Plaintiff denied shopping for groceries or engaging in other activities outside of his home. Tr. at 33. He stated he was unable to perform household chores, such as cooking, cleaning, vacuuming, and doing laundry. Tr. at 44. He stated had attended church "all the time" in the past, but no longer attended because he could not sit through the service. Tr. at 33. He denied having left the house by himself since he last worked as a truck driver because he feared passing out from pain. Tr. at 44.

He stated he took all of his medications as recommended and indicated they helped alleviate some of his pain, but also caused side effects. Tr. at 42. He endorsed side effects that included memory loss, insomnia, constipation, and dizziness. *Id.* He indicated his prescription for Lortab prevented him from driving and was illegal to take while driving commercially. Tr. at 42–43. Plaintiff stated that if he did not take his medications, he would pass out. Tr. at 43. He testified he took medication for depression and had experienced symptoms of depression since his time as a boiler operator. *Id.* He testified all

the problems he described during the hearing were consistent with his condition as of his alleged onset date in 2009. Tr. at 47.

Plaintiff sought permission to stand during the hearing. Tr. at 43. Although Plaintiff's attorney stated that Plaintiff's wife was available to testify, he subsequently stated her testimony would be corroborative of Plaintiff's testimony and agreed to submit her statement instead. Tr. at 45–46.

### ii. September 26, 2013

Plaintiff testified that he underwent two surgical procedures since the first hearing. Tr. at 410. He stated he had experienced fainting spells prior to surgery, and the doctors in the ER had informed him he needed neck surgery. *Id.* He indicated he had two vertebrae removed from his neck and three vertebrae fused in January 2013. *Id.* He testified he also underwent a surgical procedure to his thoracic spine on July 15, 2013, to remove two discs, fuse three discs, and insert a titanium rod in his spine. *Id.* He stated he needed additional surgical intervention. *Id.*

Plaintiff testified he had received intermittent treatment for his back problems because he had lost insurance coverage when both he and his wife were unemployed. Tr. at 411. He stated his back problems had not improved and had continually worsened. *Id.* Plaintiff testified that he took medication for depression and anxiety. *Id.* He indicated his pain, depression, and anxiety

were overwhelming at times. Tr. at 412. He stated he was also prescribed medication to treat fibromyalgia. *Id.*

### iii.     August 24, 2015

Plaintiff testified he stopped working as a truck driver because he was losing consciousness. Tr. at 587–88. He indicated problems with his spine caused him to pass out. Tr. at 588. He stated he complained to Dr. Castellone of constant pain that varied in intensity. *Id.*

Plaintiff estimated he could sit for 15 minutes at a time in 2009. Tr. at 590. He testified he experienced weakness in his bilateral arms and legs and had difficulty using his left hand. Tr. at 590–91. He indicated he was able to shower, dress, and engage in personal care tasks, but experienced pain and instability while performing those tasks. Tr. 592. He stated he performed some household chores, but had difficulty with any tasks that required bending. Tr. at 593. He indicated he often alternated between the floor, the bed, and a chair and generally shifted positions every 10 to 15 minutes. *Id.*

### iv.     June 23, 2017

At the hearing on June 23, 2017, Plaintiff testified he had not worked since his original onset date, when he stopped working as a truck driver because he was passing out. Tr. at 759. Plaintiff indicated the physicians who performed his surgeries told him his spinal problems caused his syncope. Tr. at 759–60. Plaintiff did not recall Dr. Sachs or his impression that Plaintiff's

back problems did not cause the syncope. Tr. at 760. Plaintiff's attorney noted Plaintiff may have been referencing interactions outside the timeframe of the record and she did not know of record evidence linking Plaintiff's back pain and syncope. Tr. at 760–61. Plaintiff testified he only saw Dr. Hoover once. Tr. at 761. He stated Dr. Plyler performed his thoracic surgery and that Dr. Plyler and Dr. Rawe, who operated on his neck, indicated his spinal problems caused his blackouts, dizziness, and fainting. Tr. at 761–62.

After discussing some of the contradictory record evidence, the ALJ granted Plaintiff's attorney thirty days to update the medical record. Tr. at 762–64.

In response to his attorney's questions, Plaintiff stated he suffered a heart attack and stroke after the last hearing. Tr. at 764. In addition, Plaintiff stated Dr. Nolan, his pain doctor, informed him there was not anything more he could do for him and he may need a wheelchair in the future. Tr. at 765. Plaintiff testified he began wearing a back brace around the time of his surgeries, at his doctors' instruction. *Id.* Plaintiff reported having obtained six months of relief following his surgeries, but stated he still needed two more surgeries. Tr. at 765–66. He explained the surgeries consisted of inserting metal rods to relieve compression in his spine, but, because his discs were continually deteriorating, the rods would move and no longer resolved the problem. Tr. at 766. Plaintiff stated his pain management

doctors advised him against receiving more injections due to a potential risk to his bones. Tr. at 766–67. He stated everything had gotten progressively worse since his last hearing and since 2009. Tr. at 767.

Plaintiff reported his ADLs were more limited than in 2009. *Id.* He stated he slept twelve to fourteen hours a day and spent time in the bathtub, shower, and anywhere else he could get relief. *Id.* He indicated that, in 2009, he relieved his pain by taking prescription pain medicine and resting as much as possible. *Id.* He recalled his back pain in 2009 as unbearable and rated it a ten out of ten. *Id.* He stated his pain in 2009 and his pain at the time of the hearing would get so bad that he could not discern its origin. Tr. at 768.

b. Vocational Expert Testimony

i. March 10, 2011

Vocational Expert ("VE") J. Adger Brown, Jr., reviewed the record and testified at the hearing on March 10, 2011. Tr. at 48. The VE categorized Plaintiff's PRW as a boiler operator as medium, skilled work and as a tractor trailer driver as medium, semi-skilled work. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but had to avoid dangerous machinery, work hazards, and driving. Tr. at 49. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there was any other

work that could accommodate those limitations. *Id.* The VE identified the jobs of quality control examiner, product sampler and weigher, and parts packer. Tr. at 49–50. The VE stated that these jobs would afford a sit/stand option so long as the hypothetical individual did not change position more frequently than every 30 to 45 minutes. Tr. at 50. Upon questioning by Plaintiff's counsel, the VE stated that the inability to focus and maintain concentration at least 20 percent of the time would preclude work. Tr. at 51–52.

### ii. August 24, 2015

VE Dawn Bergren, BA, MSW, reviewed the record and testified at the hearing on August 24, 2015. Tr. at 594–95. The VE categorized Plaintiff's PRW as a tractor trailer truck driver, *Dictionary of Occupational Titles* ("*DOT*") number 904.383-010, as medium in exertional level with a specific vocational preparation ("SVP") of four. Tr. at 594. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but was limited to frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling, as well as no exposure to work hazards, such as unprotected heights or dangerous machinery. *Id.* The VE indicated the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 594–95. The ALJ asked if there were other jobs the hypothetical individual could perform. Tr. at 595. The VE identified light jobs with an SVP

of two as a cashier II, *DOT* number 211.462-010, with 22,000 positions in South Carolina and 1,188,000 positions in the national economy; a fast food worker, *DOT* number 311.472-010, with 34,000 positions in South Carolina and 1,599,000 positions in the national economy; and an inspector/hand packager, *DOT* number 559.687-074, with 6,000 positions in South Carolina and 335,000 positions in the national economy. *Id.* The ALJ asked if Plaintiff's PRW would provide any transferable skills to the sedentary exertional level. *Id.* The VE stated it would not. *Id.* She confirmed that her testimony was consistent with the *DOT*. *Id.* Plaintiff's attorney declined to question the VE. *Id.*

### iii. June 23, 2017

Vocational Expert ("VE") Robert Brabham, Jr., reviewed the record and testified at the hearing. Tr. at 768–69. The VE categorized Plaintiff's PRW as a truck driver, *Dictionary of Occupational Titles* ("*DOT*") number 904.383-010, as medium, semiskilled work, with a specific vocational preparation ("SVP") of four, and without transferrable skills. Tr. at 768. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with no climbing ladders or scaffolds; frequent climbing of ramps or stairs, stooping, kneeling, crouching, and crawling; and no exposure to work hazards. *Id.* The VE testified the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other

jobs in the regional or national economy the hypothetical person could perform. *Id.* The VE identified light, unskilled jobs with an SVP of two as a production inspector, *DOT* number 222.687-042, with 345,000 available jobs nationally; a garment folder, *DOT* number 789.687-066, with 39,000 available jobs nationally; and a sorter, *DOT* number 789.687-146, with 158,000 available jobs nationally. Tr. at 768–69. Plaintiff's attorney did not question the VE. Tr. at 769.

The ALJ noted he would review any record updates from Plaintiff's attorney. *Id.* He explained he did not see a medically-determinable impairment justifying Plaintiff's stated reason for stopping work, his blackouts. Tr. at 769–70.

### 2. The ALJ's Findings

In his decision dated November 2, 2017, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.
2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 10, 2009 through his date last insured of September 30, 2009 (20 CFR 404.1571 *et seq.*).
3. Through the date last insured, the claimant had the following severe impairment: degenerative disc disease (20 CFR 404.1520(c)).
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

28

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with: no climbing ladders/scaffolds, frequent climbing ramps/stairs, stooping, kneeling, crouching and crawling; and, no exposure to work hazards.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on September 23, 1956 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 10, 2009, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(g)).

Tr. at 734–41.

II.  Discussion

Plaintiff alleges the Commissioner erred because the ALJ's assessment of Plaintiff's subjective complaints was not based on substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4)

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d

287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff argues the ALJ failed to properly apply the factors in SSR 96-7p[7] and 20 C.F.R. § 404.1529 governing evaluation of his symptoms and limitations. [ECF No. 13 at 14–16]. He further maintains the ALJ failed to cite evidence to support the residual functional capacity ("RFC") he assessed. [ECF No. 13 at 16].

The Commissioner maintains substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints and asserts the ALJ appropriately considered the objective medical evidence.[8] [ECF No. 17 at 8–13].

"Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529(b), (c), 416.929(b),

---

[7] The ALJ rendered his decision after March 28, 2016, the effective date for SSR 16-3p, which replaced SSR 96-7p. However, the differences between the two regulations are not at issue in this case. *See Bright v. Berryhill*, No. 6:17-1431-CMC-KFM, 2018 WL 4658494, at *10 n.4 (D.S.C. Sept. 5, 2018) ("[T]he methodology required by both SSR 16-3p and SSR 96-7p, are quite similar. Under either, the ALJ is required to consider [the claimant's] report of his own symptoms against the backdrop of the entire case record.") (internal quotations and citations omitted), *adopted by*, 2018 WL 5863373 (D.S.C. Nov. 8, 2018).

[8] The Commissioner responds to Plaintiff's specific arguments in footnotes throughout her brief. [ECF No. 17 at 10 n.1, 11 n.2, 12 n.3, 13 n.4]. These contentions read more like commentary than legal arguments and are generally addressed by the court's reasoning below.

(c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. §§ 404.1529(b), 416.929(b)). "Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the plaintiff's] statements and the rest of the evidence, including [his] history, the signs and laboratory findings, and statements by [his] treating or nontreating source[s] or other persons about how [his] symptoms affect [him]." 20 C.F.R. §§ 404.1529(c)(4).

The ALJ is not to "evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." SSR 16-3p, 2016 WL 1119029, (superseding SSR 96-7p for all decisions issued on or after March 28, 2016, as noted in the *Federal Register*); 82 Fed. Reg. 49462 n.27, 2017 WL 4790249 (explaining "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term"). "Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ is to "carefully consider

any other information" about the claimant's symptoms. 20 C.F.R. § 404.1529(c)(3).

In evaluating the non-objective evidence, the ALJ is to consider the claimant's "statements about the intensity, persistence, and limiting effects of symptoms" and should "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029. "Other evidence that [the ALJ should] consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; treatment an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

ALJs are directed to assess a claimant's RFC based on all the relevant evidence in the case record and to account for all the claimant's medically-determinable impairments. *See* 20 C.F.R. § 404.1545(a). The RFC assessment must include a narrative discussion describing how all the relevant evidence

in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ assessed Plaintiff's RFC and determined he could perform light work as defined in 20 C.F.R. § 404.1567(b) with no climbing of ladders/scaffolds; frequent climbing of ramps/stairs, stooping, kneeling, crouching and crawling; and, no exposure to work hazards. Tr. at 735. This assessment conflicted with Plaintiff's testimony that he spent half of his day lying down (Tr. at 36), could walk for a maximum of 15 to 20 minutes (Tr. at 39–40), could sit for a maximum of 30 minutes (Tr. at 40), could stand for about 15 minutes (Tr. at 590), and typically shifted positions every 15 to 20 minutes (Tr. at 593). Although the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," he determined Plaintiff's "statements concerning the

intensity, persistence and limiting effects of [those] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [his] decision." Tr. at 734.

Plaintiff contends, despite the court's September 2016 remand order, the ALJ again improperly discounted his subjective complaints based solely on a lack of objective medical evidence.[9] The court agrees.

In its September 2016 order, citing the standard above and then-recent decisions from the Fourth Circuit, the court found the ALJ failed to support his credibility finding with a detailed discussion comparing Plaintiff's subjective complaints with the record evidence, indicating how much weight he accorded Plaintiff's subjective statements, and fully explaining his reasoning. Tr. at 798–803 (citing *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). The court provided specific examples of record evidence supportive of Plaintiff's subjective complaints not discussed in the ALJ's decision, including: Dr. Hoover's November 24, 2009 observations of decreased bilateral sensation, demonstrated pain with transitional movements, and cramping, and her

---

[9] Plaintiff asserts the ALJ failed to comport with the court's 2016 order because he: (1) failed to reconcile Dr. Hoover's November 2009 notes with contemporary evidence; (2) failed to consider the other factors set out in SSR 96-7p, including Plaintiff's statements to his physicians and ADLs; (3) relied on the same ADLs and failed to explain why those ADLs were clearly inconsistent with Plaintiff's complaints; and (4) applied the same rationale in rejecting Mr. Hair's statement. [ECF No. 13 at 15–16].

interpretation of a nerve conduction study, as well as Plaintiff's statements to his physicians regarding the limiting effects of his symptoms. Tr. at 800–01. The court also suggested the ALJ obtain additional testimony or information regarding Plaintiff's reported syncope. Tr. at 801.

In addition, the court noted the ALJ erred in his consideration of Plaintiff's ADLs. Tr. at 801–02. The ALJ found Plaintiff's ADLs—specifically, his ability to bathe, dress, and assist his wife with household chores—refuted his subjective complaints. Tr. at 577–79. However, the court found the ALJ failed to explain how those specific ADLs were inconsistent with any of Plaintiff's subjective symptoms and neglected to account for record evidence and testimony indicating Plaintiff's symptoms limited his ability to perform those ADLs.[10] Tr. at 801–02.

Finally, the court found the ALJ erred in according minimal weight to a statement from Plaintiff's former supervisor, Mr. Hair, indicating Plaintiff frequently missed work due to his health. Tr. at 802. While the ALJ found Mr. Hair's statement lacked credibility because Plaintiff continued to work despite his symptoms, the court noted Plaintiff's earnings dropped

---

[10] During the hearing on August 24, 2015, Plaintiff testified that prior to his DLI, he could perform personal tasks, shower, and dress, but "with struggling, constant pain, constant worrying about falling." Tr. at 592. Plaintiff stated he "[did] what [he] could" to assist his wife with household chores, but could not lean over the sink or perform any tasks that required bending. Tr. at 592–93. Both Ms. Sykes and Plaintiff's wife indicate in their statements that Plaintiff is unable to perform household chores. Tr. at 174, 184.

significantly in the following years and found the ALJ failed to reconcile that evidence with his finding. *Id.* Because much of the evidence the ALJ failed to consider in his credibility assessment could support a limitation to sedentary work and, thus, in this case, a disability finding, the court found the ALJ's finding was not supported by substantial evidence. Tr. at 803.

On remand, the ALJ continued to base his assessment of Plaintiff's subjective complaints on objective medical evidence, finding:

> The District Court directed a further discussion regarding the credibility of the claimant. The Court recognized that multiple objective test results discussed in the prior decision were inconsistent with the claimant's statements regarding the intensity and persistence of his symptoms. As noted elsewhere in this decision, the objective evidence indicates mild degenerative disc disease as of the DLI. Nerve conduction studies were within normal limits. Dr. Highsmith noted that there was no surgical or additional lesion which would explain the whole body pain alleged by the claimant. No cause was ever established for blackout complaints. The evidence merely suggests that as of the DLI the claimant could be expected to have some mechanical back pain with greater exertion. The above RFC does not call for great exertion.

Tr. at 737. The ALJ further stated:

> I fully appreciate the temptation to carefully parse every word in the treatment record. However, looking at the *medical evidence* in its entirety, I cannot find that the rather extreme subjective complaints and limitations of the claimant are supported. As indicated elsewhere, radiographs indicate mild degenerative disc disease. EMG and nerve conduction studies indicate no radicular component. Multiple physical examinations indicate normal gait and no motor or neurological deficits.

Tr. at 739 (emphasis added). Other language added to the ALJ's prior decision summarizes the new medical evidence, discusses Dr. Hoover's observations, and notes the lack of medical explanation for Plaintiff's alleged syncope. *See* Tr. at 737–40. In addition, while the ALJ asserted he based his RFC finding on "the claimant's activities of daily living around the claimant's date last insured being inconsistent with disabling impairments" (Tr. at 739), he did not list or discuss ADLs in this decision and, thus, presumably relied on the prior decision's flawed assessment. Tr. at 740.

Since this court's 2016 order, the Fourth Circuit has emphasized that a plaintiff's "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." *Lewis v. Berryhill*, 858 F.3d at 866. It has further found an ALJ's "determination that objective medical evidence was required to support [a claimant's] evidence of pain intensity improperly increased [the claimant's] burden of proof." *Id.* Furthermore, an ALJ cannot use a claimant's ADLs to reject his alleged symptoms without "acknowledge[ing] the limited extent of those activities" or "explain[ing] how those activities showed that he could sustain a full-time job." *Brown v. Commissioner Social Security Administration*, 873 F.3d 251, 269 (4th Cir. 2017).

The ALJ has again failed to properly consider any evidence beyond objective medical findings and to adequately and specifically explain his

assessment. The ALJ touts the court for carefully parsing every word in the treatment record, but the court asks merely for compliance with the regulations and Circuit precedent. *See, e.g., Brown*, 873 F.3d at 263–66, 269–70; *Lewis*, 858 F.3d 866–70.

The court recognizes that a narrow window exists between Plaintiff's alleged onset date of August 10, 2009 and his date last insured of September 30, 2009, and that the record contains no evidence of medical treatment during this period. However, ALJs should give "retroactive consideration" to evidence created after a claimant's DLI if it "could be 'reflective of a possible earlier and progressive degeneration.'" *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012) (citing *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). Although the ALJ considered the objective evidence in the period following Plaintiff's DLI, he largely ignored the non-objective evidence of degeneration.

Evidence suggests Plaintiff struggled with pain and other symptoms that caused him to decrease his work activity over several years leading up to his alleged onset date. *See* Tr. at 32 (stating that he had left his job as a boiler operator because of depression and problems with his back, neck, and legs), 37 (testifying that he had turned down work because of his back pain), 225 (reporting lower back pain that had begun years prior), 368 (complaining of severe, gnawing back pain that had begun months prior), 393 (indicating

Plaintiff's back pain and depression had caused him to miss work while he was employed at Westvaco), 696 (reflecting consistent earnings up to $42,723.29 in 1997, followed by decreased and inconsistent earnings thereafter). The ALJ stated he accorded "minimal weight" to Mr. Hair's statement because Plaintiff "continued to work in other positions until August 2009 despite his symptoms." Tr. at 739. The ALJ's statement that he had considered "the consistency" of Mr. Hair's statement "with the other evidence," is undermined by his failure to recognize consistency between the statement and above-cited evidence that suggested Plaintiff's ability to engage in work activity had declined in the years prior to his alleged onset date.

The record contains evidence of Plaintiff's complaints of and treatment for pain in the months following his DLI. Plaintiff reported pain to Drs. Castellone, Phillips, and Plyler. *See*, e.g., Tr. at 225, 317, 368. Drs. Phillips, Plyler, and Hoover noted abnormalities on examination that were consistent with Plaintiff's complaints of pain, including cramping and spontaneous muscle activity (Tr. at 317, 365), tenderness (Tr. at 233, 243, 317), and decreased reflexes (Tr. at 317). Plaintiff's treatment over this period included pain medication, ESIs, and TENS unit. Tr. at 227, 230, 234, 341, 244, 359, 369.

The non-objective evidence shows Plaintiff reported limited ADLs and functional abilities in the period immediately following his DLI. On December 3, 2009, a little more than two months after his DLI, Plaintiff complained to Dr. Phillips of difficulty bending, lifting, and standing for greater than three-to-five minutes. Tr. at 225. He indicated his normal ADLs included work as a truck driver and "general house maintenance," but stated he could not perform those tasks without pain. *Id.* On January 6, 2010, a little more than three months after his DLI, Plaintiff reported his lower back and buttock pain were exacerbated by carrying items, bending, and sometimes walking and were improved by medication "as long as he sits still." Tr. at 233. He indicated his ADLs "consisted of him just resting and taking it easy due to the pain." *Id.* Plaintiff's wife completed a disability report on his behalf on July 30, 2010—10 months following his DLI Tr. at 153–61. She indicated Plaintiff needed to rest several times during the day, had difficulty remembering and being around others, could not sit for long periods, had difficulty getting out the bed and the bathtub, shifted positions frequently, had difficulty driving, and could no longer assist with shopping, cooking, housework, and laundry. Tr. at 159. As previously noted, the ALJ provided no further discussion of Plaintiff's ADLs on remand despite the court's prior finding. Thus, the ALJ has cited insufficient evidence to support a finding that Plaintiff's ADLs are inconsistent with his subjective symptoms

and has failed to reconcile evidence regarding Plaintiff's ADLs in the months following his DLI.

The ALJ has assessed an RFC that does not accommodate Plaintiff's self-reported sitting, standing, and walking limitations without having adequately explained his reasons for rejecting Plaintiff's allegations or having provided reasons to support the RFC finding. The ALJ stated he had considered Plaintiff's "complaints of low back pain in limiting the amount he [could] sit, stand, walk, lift, carry, climb, stoop, kneel, crouch, and crawl" and had "restricted his exposure to work hazards as a precaution for alleged blackouts, effects of pain, and medication." Tr. at 739. He limited Plaintiff to "light work," but did not specifically limit his sitting, standing, or walking.[11] *See* Tr. at 739. He specified the RFC "[was] based on the claimant's activities of daily living around the claimant's date last insured being inconsistent with disabling impairments." *Id.* As discussed above, the ALJ has failed to explain his reasons for finding Plaintiff's ADLs to be inconsistent with his allegations and has ignored evidence to the contrary in forming his conclusion. In addition, the record contains no assessment of Plaintiff's exertional and non-exertional abilities, as Plaintiff was not referred for a consultative examination and his record was not reviewed by a state agency medical

---

[11] The ALJ assessed an RFC for light work, which generally "requires a good deal of walking or standing." 20 C.F.R. § 404.1567(b).

consultant.[12] In view of the foregoing, we are left with an RFC assessment that is not supported by substantial evidence in that it does not assess Plaintiff's capacity to perform relevant functions. *See Mascio*, 780 F.3d at 636.

III.  Conclusion

The court is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.

In light of this case's lengthy procedural history, the court has considered whether it would be most appropriate to reverse and remand it for an award of benefits. "Whether to reverse and remand for an award of benefits or remand for a new hearing rests within the sound discretion of the district court." *Smith v. Astrue*, No. 10-66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987). "The Fourth Circuit has explained that outright reversal— without remand for further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a

---

[12] The ALJ stated he had accorded "significant weight" to "the medical opinions of the DDS medical consultants." Tr. at 739. Plaintiff's record was reviewed by two state agency psychological consultants who determined the record contained insufficient evidence of mental disorder. Tr. at 251–64, 266–79.

decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014), *citing Breeden v. Weinberger*, 493 F.3d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 f.3d 326, 333 (4th Cir. 1992). An award of benefits is appropriate when "a substantial amount of time has already been consumed." *Davis v. Astrue*, No. 07-1621-JFA, 2008 WL 1826493, at *5 (D.S.C. Apr. 23, 2008) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)).

The court previously found reversal and remand for an award to be inappropriate in the absence of clear and convincing evidence that Plaintiff was entitled to benefits. However, the undersigned is now inclined to reverse and remand for an award of benefits based on the Fourth Circuit's holding in *Lewis* and the substantial time this case has been pending. Although the undersigned acknowledges the absence of medical records during the relevant period, imaging reports in the six months following Plaintiff's DLI reflect objective evidence of mild degenerative facet arthropathy at L5–S1 (Tr. at 222), acute nerve root irritation bilaterally at S1 (Tr. at 365), mild diffuse cervical spondylosis and disc osteophyte complex (Tr. at 307), moderate

central canal stenosis in the cervical spine (Tr. at 307), mild cord flattening in the cervical spine (Tr. at 307), and central disc protrusion at T9–10 (Tr. at 316). Because the objective medical evidence showed a condition that could reasonably produce Plaintiff's alleged symptoms, a proper evaluation of the limiting effects of his symptoms required thorough review of the non-objective evidence. *See Lewis*, 858 F.3d at 866; 20 C.F.R. §§ 404.1529(b), (c). The unrefuted non-objective evidence[13] suggests Plaintiff experienced functional impairment prior and subsequent to his DLI such that he would not have been capable of meeting the exertional requirements of light work. Over this same period, Plaintiff consistently reported pain to his physicians, demonstrated signs of impairment on physical examination, and received treatment that included pain medication, ESI, and TENS unit. *See,* e.g., Tr. at 225, 227, 233, 317, 359, 356, 369. As the record contains unrefuted evidence to suggest Plaintiff was unable to meet standing and walking demands for work above the sedentary exertional level on his DLI, the Medical-Vocational Guidelines directed a finding of "disabled." *See* 20 CFR

---

[13] The agency neglected to refer Plaintiff to a consultative exam or to otherwise assess his functional abilities in the period immediately following his DLI. Plaintiff filed his claim for DIB on February 22, 2010, less than five months after his DLI. A consultative examination or consultant's RFC assessment at that time would have been valuable in informing the ALJ's RFC assessment. However, as nearly 10 years have passed since Plaintiff's DLI and his impairments have progressively worsened, it seems unlikely that a consultative examination or a medical consultant's opinion would be beneficial.

Part 404, Subpart P, App'x 2, § 201.10 (directing a finding of "disabled" for claimants with a maximum sustained work capability limited to sedentary work that meet the following criteria: closely approaching advanced age; limited or less education; and history of skilled or semiskilled work, without transferable skills). Therefore, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), this matter is reversed and remanded for an award of benefits.

IT IS SO ORDERED.

Shiva V. Hodges

August 5, 2019
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge